UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

THE GOOD SAMARITAN HOME, INC., a )
not-for-profit corporation, )
      Plaintiff, )
)
  vs. )      3:11-cv-00075-RLY-WGH
)
LANCASTER POLLARD & CO., an Ohio )
corporation, STEVEN W. KENNEDY, JR., )
JASON L. GEORGE, PECK SHAFFER & )
WILLIAMS, LLP, and DOE )
DEFENDANTS 1-10, )
      Defendants. )

**ENTRY ON THE MOTION OF PECK, SHAFFER & WILLIAMS LLP TO DISMISS THE AMENDED COMPLAINT, DEFENDANT JASON L. GEORGE'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT, AND MOTION OF DEFENDANTS LANCASTER POLLARD & CO. AND STEVEN W. KENNEDY, JR., TO DISMISS THE AMENDED COMPLAINT**

In July 2006, Plaintiff, the Good Samaritan Home, Inc. ("Good Sam"), entered into a bond interest rate swap transaction with Lehman Brothers Special Financing, Inc. ("Lehman"), brokered by Defendant Steven W. Kennedy, Jr. ("Kennedy"), Vice President and investment banker with Defendant Lancaster Pollard & Co. ("Lancaster"). After Lehman filed for bankruptcy two years later, Lancaster advised Good Sam to terminate the agreement. In short, the termination allegedly was botched, for which Lehman sued Good Sam. As a result, Good Sam filed this lawsuit against Lancaster and Kennedy, claiming breach of contract, negligence in rendering professional services, breach of

fiduciary duty, and punitive damages in Counts I-IV, respectively. Good Sam also alleges claims in Count V against Defendants Peck, Shaffer & Williams ("Peck") and Jason L. George ("George"), an attorney and partner at Peck, who advised Lancaster regarding the termination, for legal malpractice. Finally, in Count VI Good Sam alleges that Peck is liable for George's acts and omissions under the principal-agent theory of liability. Defendants filed separate motions to dismiss the Amended Complaint. For the reasons set forth below, the motions are **DENIED**.

I. Background

In 2005 after a solicitation by Kennedy, Good Sam retained the services of Lancaster. (Amended Complaint ¶ 12). Lancaster aided Good Sam in issuing $6,955,000.00 worth of Adjustable Rate Demand Economic Development Bonds to finance building improvements to Good Sam's residential and nursing facilities. (*Id.* ¶ 13). Kennedy then advised that Lancaster broker a bond interest rate swap agreement (the "agreement") between Good Sam and Lehman. (*Id.* ¶¶ 14, 16). Good Sam and Lehman executed the Lancaster-brokered agreement in July 2006. (*Id.* ¶ 16). Lancaster continued servicing Good Sam with regard to its bond obligations through 2010. (*Id.* ¶ 17).

In September 2008, Lehman filed for bankruptcy, prompting Kennedy, on behalf of Lancaster, to advise Good Sam to withhold its next payment to Lehman and await further instructions while Lancaster consulted with outside counsel, which Good Sam did. (*Id.* ¶¶ 18-21). George offered to provide legal advice to Lancaster's clients, including

Good Sam, regarding their rights under their agreements with Lehman post-bankruptcy, and Lancaster accepted. (*Id.* ¶¶ 51-52). George and Allison Binkley ("Binkley"), an associate at Peck who is no longer a defendant in this case, reviewed the files of Lancaster's clients, including Good Sam, and their agreements with Lehman. (*Id.* ¶¶ 7, 52). The Peck attorneys then developed a termination procedure for which they prepared written notices and instructions for their transmittal to Lehman. (*Id.* ¶¶ 53-54). Lancaster transmitted the Peck attorneys' legal advice to Good Sam in substantially the same form generated by the attorneys. (*Id.* ¶ 56). Peck billed Lancaster for $5,000.00 in legal fees related to the termination advice for Lancaster's clients, including Good Sam. (*Id.* ¶ 58). Good Sam paid Lancaster $5,000.00 for its services relating to the termination, a portion of which the invoice designated as "legal fees." (*Id.* ¶¶ 23, 57).

Per Lancaster's instructions, Good Sam signed and faxed the termination notice to Lehman and wired a payment for the amount due prior to the termination in November 2008. (*Id.* ¶¶ 22-23, 56). On May 27, 2009, Lehman representatives contacted Good Sam claiming to have no record of the termination. (*Id.* ¶ 24). Good Sam provided Lehman facsimile confirmations that demonstrated transmission of the notices via facsimile to Lehman. (*Id.*). Lehman informed Good Sam that under the agreement, facsimile transmission does not constitute proper delivery and that under New York law, the termination was ineffective. (*Id.* ¶ 25; ISDA Master Agreement ("Agreement") ¶ 10). Lancaster continued to assure Good Sam that the termination was effectively terminated, but provided no authority for its assertion. (*Id.* ¶ 27). After assessing Lehman's claims,

3

Good Sam and Lehman entered into a termination agreement to settle the claims in exchange for payment from Good Sam. (*Id.* ¶ 28).

Based on these facts, Good Sam first alleges breach of contract against Lancaster and Kennedy in Count I. (*Id.* ¶¶ 30-34). According to Good Sam, Good Sam accepted an offer by Kennedy (on behalf of Lancaster) to advise it regarding the Lehman bankruptcy and termination of the agreement, paid for the services, and relied on Lancaster's advice, which ultimately resulted in an ineffective termination. (*Id.* ¶¶ 30-33). In other words, Lancaster committed a breach of contract for which Good Sam suffered damages in the form of the defense and settlement of Lehman's claims. (*Id.* ¶ 34). In Count II, Good Sam claims that Lancaster and Kennedy were negligent in rendering their professional services to Good Sam. (*Id.* ¶¶ 36-40). Specifically, Good Sam contends that Lancaster and Kennedy owed a duty of care as Good Sam's advisers and breached that duty by providing ineffective advice on which Good Sam relied regarding the termination notice and its transmission by facsimile and for which Good Sam suffered damages. (*Id.*). Count III encompasses a claim of breach of fiduciary duty by Lancaster and Kennedy, demonstrated by Good Sam's detrimental reliance on Kennedy and Lancaster's expertise in bond rate interest swap agreements. (*Id.* ¶¶ 42-45). Because Good Sam alleges that Lancaster and Kennedy's attempt to obscure the validity of Lehman's claims and the culpability of their own conduct, assertion that Lehman's claims were baseless, and failure to provide assistance in defending the Lehman claims were willful and wanton, or at least constituted gross negligence, Count IV contains a request for punitive damages.

4

(*Id.* ¶ 44, 47-49).

Counts V and VI target Peck and George. In Count V, Good Sam alleges legal malpractice by Peck and George. To support its claim, Good Sam asserts that an attorney-client relationship between the parties existed, because Good Sam knew that the advice from Lancaster was generated by an attorney, paid for legal advice, and reasonably relied on the advice, and because Peck and George knew that Good Sam would rely on their advice. (*Id.* ¶¶ 59-60). Finally, Good Sam claims that Peck is liable for the damages sustained as a direct and proximate cause of George's acts and omissions under the principal-agent theory of liability. (*Id.* ¶¶ 65-66).

Defendants ask the court to dismiss Good Sam's Amended Complaint for failure to state a claim under Rule 12(b)(6).

## II. Motion to Dismiss Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to file a motion to dismiss based on the opposing party's "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The Federal Rules of Civil Procedure impose only a notice-pleading requirement for complaints, meaning that detailed factual allegations are not necessary; "the [plaintiff] need only 'give the defendant fair notice of what the claim is and the grounds on which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). While the plaintiff must do more than simply recite the elements of a cause of action and must plead facts sufficient "to raise a right to relief above the speculative level," at this stage the court is

5

required to analyze only the legal sufficiency of the complaint, and not the factual merits of the case. *Twombly*, 550 U.S. at 555; *Autry v. Northwest Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). The court must take all facts alleged in Good Sam's Amended Complaint as true and draw all reasonable inferences in the light most favorable to Good Sam. *Autry*, 144 F.3d at 1039. Good Sam must plead facts that, when accepted as true, show the plausibility of the claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). A claim is plausible if the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, and not just the sheer possibility that the defendant acted unlawfully. *Id.*

## III. Discussion

### A. Lancaster and Kennedy's Motion to Dismiss the Amended Complaint

Lancaster and Kennedy assert that the Amended Complaint is materially deficient and thus should be dismissed as a matter of law, because Good Sam failed to allege that (1) Lehman did not receive actual notice of Good Sam's termination of the agreement, and (2) its settlement with Lehman was fair and reasonable. Good Sam contends that Lancaster's arguments attack the merits of the case rather than the sufficiency of Good Sam's factual allegations in support of its causes of action. The court agrees with Good Sam and finds that, if accepted as true, the facts alleged in the Amended Complaint are sufficient to support its claims for the purposes of a motion to dismiss.

#### 1. Effectiveness of the termination

Lancaster and Kennedy insist that Good Sam's claims against them rest entirely on

the proposition that transmission of the termination notice by fax was ineffective under the agreement; however, under New York law, the form of the termination notice is of little importance so long as actual notice of termination has in fact been given. *See Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of New Jersey*, 706 F.Supp.2d 350, 360 (S.D.N.Y. 2009). Thus, Lancaster and Kennedy claim that Good Sam's legal assertion that their notice was ineffective is false, because they have not alleged that Lehman did not receive the facsimile notice or that Lehman did not have actual notice of the termination.

New York law does not state that termination of a contract by facsimile alone is an effective means of transmission, despite a specification in a contract to the contrary; rather, termination by facsimile is effective transmission if the fax served as actual notice to the receiving party of the termination, even where the form violates the contract. *Id.* For Good Sam's claim to be barred at this stage under New York law, Good Sam must have pled facts to support Lehman's actual notice of the termination via facsimile. In fact, Good Sam pled that "[o]n or about May 27, 2009, representatives from Lehman contacted [Good Sam] asserting that Lehman had no record of [Good Sam] terminating the bond interest rate swap Agreement." *See* Amended Complaint ¶ 24. The Amended Complaint contains no allegation that Lehman actually admitted receiving the fax, only Lehman's opinion that transmission by facsimile would be considered ineffective under New York law. *See id.* at ¶ 25. Specific factual details, such as whether the fax machine malfunctioned or whether the fax number was disconnected are not necessary at this stage

7

of the proceedings. All that is necessary is a sufficient factual basis to support the claims. *See Twombly*, 550 U.S. at 555. Taking these facts in the light most favorable to Good Sam, the inference that Lehman did not receive actual notice of the termination is logical. Therefore, Good Sam has plead with sufficient particularity facts which support its claims against Lancaster and Kennedy.

        **2.**        **Reasonableness of the settlement**

Lancaster and Kennedy also contend that the omission of an allegation that the amount paid as a settlement with Lehman was fair and reasonable is fatal to the Amended Complaint. To support this contention, Lancaster and Kennedy cite several cases for the proposition that a party seeking indemnification for amounts paid in settlement of a disputed claim must establish that its settlement was fair and reasonable. *See Estate of Williams v. S. Ind. Gas and Elec. Co., Inc.*, 551 F.Supp.2d 751, 759-761 (S.D.Ind. 2008); *Price v. Amoco Oil Co.*, 524 F.Supp. 364, 367-68 (S.D.Ind. 1981); *Bethlehem Steel Corp. v. Sercon Corp.*, 654 N.E.2d 1163, 1168 (Ind.App. 1995); *Sink & Edwards, Inc. v. Huber, Hunk & Nichols, Inc.*, 458 N.E.2d 291, 297 (Ind.App. 1984). While this may be true, each case cited was decided at the summary judgment stage of the proceedings. *See id.* Furthermore, these cases indicate that the reasonableness of a settlement is a question for the court, and that such a decision is premature if the question of liability remains unresolved. *See, e.g., Estate of Williams*, 551 F.Supp.2d at 760 (because Vectren's entitlement to indemnity remained unresolved, it was premature to analyze the reasonableness of the settlement amounts). None of the cases cited by Lancaster or

8

Kennedy claim that the reasonableness of the settlement is an element of the causes of action alleged in the complaint, or that the omission of that allegation is fatal to a claim at this stage in the proceedings. Good Sam has sufficiently pled facts to support its claims in the Amended Complaint; therefore, Lancaster and Kennedy's Motion to Dismiss under Rule 12(b)(6) must be denied.

### B. Peck and George's Motions to Dismiss

Peck and George assert that the claims against them must be dismissed under Rule 12(b)(6), because (1) Good Sam fails to allege facts to support the existence of an attorney-client relationship with Peck or it's lawyers, (2) the legal malpractice claim is time barred, (3) Good Sam voluntarily settled with Lehman, and (4) Good Sam identified neither its basis for the settlement with Lehman nor the settlement terms and amount. Good Sam again counters that, like Lancaster and Kennedy, Peck and George's attack on the merits of the case and the accuracy of Good Sam's allegations is improper at this stage of the proceedings. The court agrees that Good Sam's Amended Complaint sufficiently states claims for legal malpractice against Peck and George.

#### 1. Attorney-client Relationship

Peck and George argue that under Ohio law, which they claim applies, Good Sam failed to plead a set of facts from which the existence of an attorney-client relationship can be inferred. Because the existence of an attorney-client relationship is a necessary element of a legal malpractice claim, Peck and George conclude that dismissal of the claims against them is required. Good Sam does not consent to the application of Ohio

9

law, but claims that under either Indiana or Ohio law, the Amended Complaint pleads facts which are sufficient to state a claim for legal malpractice. At this stage, the court agrees that as alleged, the facts in the Amended Complaint allow the court to draw a reasonable inference of the existence of an attorney-client relationship between Peck and its attorney, George, and Good Sam.

In both Indiana and Ohio, the existence of an attorney-client relationship is an essential element of a legal malpractice claim. *See Landis v. Hunt*, 610 N.E.2d 554, 558 (Ohio Ct. App. 1992); *Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind. Ct. App. 1991). An attorney-client relationship exists in Ohio "when an attorney advises others as to their legal rights, a method to be pursued, the forum to be selected, and the practice to be followed for the enforcement of their rights." *Landis*, 610 N.E.2d at 558. The payment of a fee is also a factor, though not essential. *Id.* Generally, an attorney is immune from liability to third parties arising from his performance as an attorney on behalf of the client; however, an attorney retained by a fiduciary owes a similar duty to those with whom the client has a fiduciary relationship. *Arpadi v. First MSP Corp.*, 628 N.E.2d 1335, 1338-39 (Ohio 1994).

In Indiana, an attorney-client relationship may be implied from the conduct of the parties, but must be consensual. *Hacker*, 570 N.E.2d at 955. An alleged client's unilateral belief does not create an attorney-client relationship. *Id.* However, an attorney in effect consents to the existence of an attorney-client relationship when a client reasonably relies on the attorney's statements or conduct to its detriment, and the attorney

10

is aware of such reliance and fails to negate it. *Id.* at 956.

Peck and George compare the facts of this case to *Landis v. Hunt*, in which the Ohio Court of Appeals held that an attorney-client relationship did not exist between the Landis's and William Ahern ("Mr. Ahern"), an attorney with which the Landis's lawyer consulted regarding the Landis's case. 610 N.E.2d at 560. The Landis's attorney contacted Mr. Ahern by phone to discuss a potential medical malpractice claim, and Mr. Ahern advised that the statute of limitations provided a complete defense. *Id.* at 556. Mr. Ahern had no record of the Landis's case, no knowledge of an attorney-client relationship between himself and the Landis's, no fee was exchanged, and the case was not referred to him. *Id.* at 556, 560. The Court found that no facts existed to establish that a communication took place which was so confidential as to invoke an attorney-client relationship, and therefore affirmed summary judgment on the Landis's legal malpractice claim against Mr. Ahern. *Id.* at 560.

The Ohio Court of Appeals also rejected a claim that an attorney-client relationship between a corporation through which the plaintiff purchased convertible promissory notes and the company's law firm that prepared the notes extended to the plaintiff. *Saby v. Thompson, Hine & Flory*, 1979 WL 210160, at *2 (Ohio App. 8 Dist. May 17, 1979). While the Court mentions a lack of direct contact between the plaintiff and law firm, factual details are sparse and payment of a fee is not discussed. *Id.* at *1-2. The Court noted that under certain circumstances, such as an improperly drawn will, an attorney-client relationship may be established between the attorney and a third-party

beneficiary, but the facts of this case were inapplicable. *Id.* at *2.

Despite Peck and George's arguments, at this point, Good Sam has pled sufficient facts to create a reasonable inference of an attorney-client relationship. First, each of the cases cited was decided at the summary judgment stage. Furthermore, the cases cited by Peck and George are somewhat distinguishable from the factual circumstances in this case. For example, unlike *Landis* and *Saby*, Good Sam alleges it paid Lancaster a fee for legal services. (Amended Complaint ¶¶ 57-58). Also, Good Sam alleges that George reviewed the files of Lancaster's clients, including Good Sam's files and agreement with Lehman. (*Id.* ¶ 52). Like the standard established in *Hacker*, not only does Good Sam allege that George developed the procedure by which Good Sam was to terminate the agreement, but also that George prepared written notices from Good Sam to Lehman and instructions for their transmittal, knowing that Good Sam would rely on this advice. (*Id.* ¶¶ 53-55). Finally, Good Sam alleges that Lancaster transmitted the legal advice in substantially the same form as it was generated by Peck's attorneys, and Good Sam relied on and followed the advice. (*Id.* ¶¶ 56, 60). These facts taken as true plausibly infer the existence of an attorney-client relationship under either Indiana or Ohio law. Accordingly, Good Sam has successfully pled a claim of legal malpractice.

### 2. Voluntary Settlement

Like Lancaster and Kennedy, Peck and George argue that under New York law, Good Sam's termination of the agreement with Lehman was effective; therefore, Lehman's claim against Good Sam was not viable, and Good Sam's settlement with

Lehman was voluntary. Because Good Sam settled voluntarily and without informing Peck and George, Peck and George claim that Good Sam is barred from seeking recovery of that settlement from them. Good Sam again responds that Lehman's claims were not baseless, because Good Sam cannot demonstrate actual notice of the termination; therefore, the settlement was not voluntary.

For the same reasons set forth above, the court agrees that the facts taken in the light most favorable to Good Sam create the inference that Lehman had a valid claim against Good Sam. As the court noted above, the Amended Complaint contains no allegation that Lehman actually admitted receiving the fax, only Lehman's opinion that transmission by facsimile would be considered ineffective under New York law. *See* Amended Complaint ¶ 25. Furthermore, the case cited by Peck in support of its argument is not applicable. In *Consolidated Rail Corp. v. Allied Corp.*, the plaintiff sought to recover from the defendants voluntary payments to residents damaged by a chemical leak from the plaintiff's rail car, claiming that the defendants were negligent. 882 F.2d 254, 255 (7th Cir. 1989). The Seventh Circuit upheld the ruling of the district court, affirming dismissal of the case on the grounds that Indiana does not recognize contribution among joint tortfeasors. *Id.* Unlike the case at hand, the plaintiffs in *Consolidated Rail Corp.* were not permitted to sue the defendants under a clear provision of Indiana law prohibiting contribution among joint tortfeasors. *Id.* Here, the success of Lehman's claim against Good Sam turns on whether Good Sam's facsimile transmission served as actual notice under New York law - a fact-sensitive inquiry that should be analyzed at a
13

later stage once the facts are more developed.

### 3. Statute of Limitations

Next, Peck and George contend that Good Sam's legal malpractice claim must be dismissed as time-barred, because the statute of limitations began to run on May 27, 2009, the date on which Lehman notified Good Sam that the termination was ineffective, and this action was filed more than two years later on August 3, 2011. Again, the parties do not agree on whether Ohio or Indiana law applies; however, Good Sam disputes the date of accrual and submits that the claims are not barred by either Indiana's two-year statute of limitations or Ohio's one-year statute of limitations.

In Ohio, a legal malpractice claim must commence within one year after the cause of action accrued. *Zimmie v. Calfee, Halter & Griswold*, 538 N.E.2d 398, 400 (Ohio 1989). "[A]n action for legal malpractice accrues and the statute of limitations begins to run when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later." *Id.* at 401. In *Zimmie*, the Ohio Supreme Court found that defining when a cause of action accrues in a legal malpractice action requires an inquiry into the particular facts of the action. *Id.* In Indiana, the statute of limitations for attorney malpractice is two years and begins to run when the plaintiff knows of, or in the exercise of ordinary due diligence could have discovered, the tortious conduct. *Ickes v. Waters*,

14

879 N.E.2d 1105, 1109 (Ind.Ct.App. 2008). When a plaintiff should have discovered the malpractice and thus triggered the statute of limitations depends on the facts of the individual case. *Behrendsen v. Rogers*, 858 N.E.2d 257 (Ind.Ct.App. 2006).

Under both Indiana and Ohio law, a determination of the accrual date of the statute of limitations for a legal malpractice case is a fact-sensitive inquiry; therefore, in this case determination of the accrual date based solely on the facts presented in the Amended Complaint and before discovery would be premature. For the purposes of a motion to dismiss, Good Sam must only plead facts with sufficient particularity to state a plausible claim for relief. *See Iqbal*, 129 S.Ct. at 1949. Without more facts, the court cannot determine when Good Sam knew or could have discovered the alleged legal malpractice. Accordingly, Peck and George's motion to dismiss the legal malpractice claims as time-barred must be denied.

### 4. Amount of Damages

Finally, Peck and George contend that Good Sam's legal malpractice claims against them must be dismissed, because Good Sam failed to specify an amount of damages. Peck and George's citation to *Pisciotta v. Old Nat'l Bancorp* as sufficiently analogous support, without any explanation comparing that case to the case at hand, does little to persuade the court. 499 F.3d 629 (7th Cir. 2007). Essentially, the court is left with Peck and George's conclusory allegation that Good Sam's allegations as to damages are insufficient to state a claim under Rule 12(b)(6). While the amount of the settlement may not be known at this time, that information may be sought in discovery.

Furthermore, Good Sam gave notice to Peck and George in its Amended Complaint that it is seeking to recover the settlement payment to Lehman, as well as attorneys' fees and costs related to the settlement of its claims with Lehman. *See* Amended Complaint ¶¶ 63, 66. Accordingly, Good Sam pled damages sufficient to survive a motion to dismiss.

## IV. Conclusion

For the reasons set forth above, Defendants' Motions to Dismiss (Docket ## 26, 33, 56) are **DENIED**.

**SO ORDERED** this 20th day of March 2012.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

Jack F. Fuchs
THOMPSON HINE LLP
jack.fuchs@thompsonhine.com

Abram B. Gregory
TAFT STETTINIUS & HOLLISTER LLP
agregory@taftlaw.com

Meagan D Rideout
RHINE ERNEST LLP
mrideout@rhine-ernest.com

Reed S. Schmitt
RHINE ERNEST, LLP
rschmitt@rhine-ernest.com

Lawrence D. Walker
TAFT STETTINIUS & HOLLISTER LLP
walker@taftlaw.com

Alfred J. Weisbrod
WEISBROD LAW OFFICE
alweisbrod@aol.com